UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 APR 19  PM 4: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MASSACHUSETTS ASSET FINANCING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-00-S-1937-S |
| | ) | |
| THE WEST JEFFERSON AMUSEMENT AND PUBLIC PARK AUTHORITY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| SUNTRUST BANK, | ) | |
| | ) | |
| Intervenor. | ) | |
| | ) | |
| MASSACHUSETTS ASSET FINANCING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-01-S-2040-S |
| | ) | |
| THE WEST JEFFERSON AMUSEMENT AND PUBLIC PARK AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

APR 19 2002

**MEMORANDUM OPINION**

These actions are before the court on motions filed by plaintiff, Massachusetts Asset

Financing Corp., seeking, first, the consolidation of both cases for purposes of considering the

appointment of a receiver,[1] and, asking the court to appoint a receiver.[2]

---

[1]See doc. no 196 in Civil Action No. CV-00-S-1937-S, and, doc. no. 121 in Civil Action No. CV-01-S-2040-S.

[2]See doc. no 197 in Civil Action No. CV-00-S-1937-S, and, doc. no. 118 in Civil Action No. CV-01-S-2040-S.



## I. FACTUAL BACKGROUND

Defendant, the West Jefferson Amusement and Public Park Authority (the "Authority"), was incorporated in 1996 by eleven municipalities within Jefferson County, Alabama,[3] for the purpose of developing a parcel of property into an amusement park and recreation facility to be known as "VisionLand." The Authority subdivided the property into three areas, the largest of which (approximately 200 acres) was devoted to the VisionLand amusement park. Another area, approximately 40 to 50 acres in size, was leased to VisionLand Outlet Center, L.L.C., for purposes of constructing and operating an outlet mall now known as "WaterMark Place." The remaining area, approximately 40 acres in size, and referred to by the parties as the "E-Zone," has not been developed. The VisionLand amusement park opened during May of 1998.

The Authority obtained financing for the VisionLand project, in part, through bond issues. Currently outstanding is the Authority's issue of First Mortgage Revenue Bonds (VisionLand Alabama Project), Series 1999, in the aggregate principal amount of $90 million.[4] Those bonds were issued pursuant to a mortgage and trust indenture dated as of February 1, 1999, and recorded with the Office of the Judge of the Probate Court for Jefferson County, Alabama, Bessemer Division, on

---

[3]The West Jefferson Amusement and Public Park Authority was incorporated pursuant to Alabama Code §§ 11-47-210 – 239 (1975) by the following municipalities: the City of Adamsville; the City of Bessemer; the City of Birmingham; the City of Brighton; the City of Fairfield; the City of Hueytown; the City of Lipscomb; the Town of Maytown; the Town of North Johns; the Town of Sylvan Springs; and the Town of Vance.

[4]The Mortgage and Trust Indenture documents, dated as of February 1, 1999, indicate that the Series 1999 bonds were issued

> for the purpose of financing the acquisition, construction and equipping of additions and improvements (the "Series 1999 Improvements") to an existing amusement and recreational facility (which facility is herein called the "Project"), and to refund the Authority's First Mortgage Revenue Bonds (VisionLand Alabama Project) Series 1996, dated December 1, 1996, now outstanding in the aggregate principal amount of $60,000,000 and the Authority's First Mortgage Revenue Bonds (VisionLand Alabama Project) Series 1998, dated April 1, 1998, now outstanding in the aggregate principal amount of $5,000,000.

Defendant's Exhibit 1, at 45.

February 10, 1999. A supplemental indenture, dated as of June 1, 2000, was recorded on August 24, 2000.[5] SunTrust Bank ("SunTrust"), which has intervened as a defendant in Civil Action No. CV-00-S-1937-S, is trustee, as successor in interest to Chase Manhattan Bank, the original indenture trustee.

Another source of funding for operation of the amusement park has been provided by the eleven municipalities, which executed funding agreements, by the terms of which the municipalities promised to contribute a total of $2,952,360 annually to the Authority.[6]

For the year ending September 30, 1998, the Authority's gross revenues were $13,647,682, producing a 13.2% profit in the amount of $1,797,196. During 1999, the Authority's gross revenues sagged some $879,630, to $12,768,052 (or 6.45% less than the previous year). More troubling than that fact, however, was this one: the Authority's retained earnings were negative $7,409,156. During 2000, the Authority's gross revenues declined even more steeply to $10,376,033 — *i.e.*, $2,393,019 (or 18.7%) less than 1999, and $3,271, 649 (or 24%) less than 1998 — and its *negative* retained earnings figure almost doubled, to minus $14,171,250.[7]

The Authority ultimately defaulted on the payment terms of its mortgage and trust indenture,

---

[5]*See* Opposition of SunTrust Bank as Trustee to the Motion of Massachusetts Asset Financing Corporation for the Appointment of a Receiver (No. CV-00-S-1937-S, doc. no. 206), at 2.

[6]Plaintiff's Exhibit 7, at 10. The "Funding Agreements" were described as follows in the Mortgage and Trust Indenture:

> any of those certain eleven funding agreements by and between each of the Authorizing Municipalities individually and the Authority, and providing for the grant and payment of certain moneys in certain fiscal years of such Authorizing Municipality to the Authority and, as applicable, the pledge of certain taxes by each such Authorizing Municipality to secure such payment, all as provided in each Funding Agreement.

Defendant's Exhibit 1, at 15.

[7]Plaintiff's Exhibit 7, at 3; Plaintiff's Exhibit 8, at 2.

and it was notified of that default by SunTrust on August 10, 2000, February 16, 2000, and August 1, 2001. Eight months later, on April 8, 2002, SunTrust notified the Authority that it had failed to comply with the requirements of § 10.2 of the indenture,[8] and that there were insufficient funds on deposit with the trustee to make the interest payments due on February 1, 2001, August 1, 2001, and February 1, 2002. The trustee therefore demanded, pursuant to § 13.2(b) of the indenture,[9] that the Authority surrender possession of VisionLand Park to the trustee. The trustee further stated:

> Based on the continued poor performance and financial condition of VisionLand Park ("VisionLand"), including VisionLand's inability to produce adequate remedies to cover debt service on the Bonds and trade payables incurred in the operation of VisionLand, and the current financial status of the Project, further notice is hereby given to the Authority that the Trustee at the direction of the Bondholders shall not fund at this time any additional expenses of the Project, except as to maintain and protect the assets of the Project. It is currently the intent of the Trustee not to open the park for operation for the 2002 Season.
>
> Pursuant to the terms of the Authority's agreement with International Theme Park Services, Inc. ("ITPS"), ITPS will continue to market VisionLand for sale. Additionally, the Trustee plans to retain the services of ITPS to maintain VisionLand in such condition as to attract the best offer for sale of VisionLand. Per our mutual

---

[8] Section 10.2 required the Authority to maintain a special trust fund for the payment of principal and interest on the bonds. *See* Defendant's Exhibit 1, at 67.

[9] Section 13.2(b) provides for the following remedy on default:

> Possession of Project. The Trustee shall have the power to require the Authority to surrender possession of the Project to it, and the Authority shall, upon demand so to do by the Trustee, forthwith surrender to the Trustee actual possession of the Project or such part or parts thereof as the Trustee may designate, and the Trustee shall take possession thereof and may wholly exclude the Authority and its agents therefrom. The Trustee shall thereafter have the power to operate, lease, or otherwise control, use and dispose of the Project in the manner it deems most beneficial to the Bondholders, including the enforcement of the Funding Agreements. The Trustee shall further have the power to make, at the expense of the Trust Estate, such repairs, replacements, alterations, additions or improvements to the Project as it may consider advisable, to collect the income therefrom and to pay all proper charges and maintenance expenses thereof, including all proper disbursements by the Trustee.

Defendant's Exhibit 1, at 108 (emphasis in original).

4

understanding, this is in the long term best interest of VisionLand.[10]

The plaintiff in these consolidated actions, Massachusetts Asset Financing Corp. ("MAFC"), obtained two judgments against the Authority for breach of contract: *i.e.*, a judgment in the amount of $602,850.90 was entered in favor of MAFC on April 20, 2001, by U.S. District Judge Horace Dean Buttram, Jr., in Civil Action No. CV-00-BU-1937-S,[11] and a second judgment for $1,060,168.71 in favor of MAFC was entered by the same judge on August 15, 2001 in Civil Action No. CV-01-BU-2040-S.[12]  MAFC recorded the judgments, and attempted to collect, primarily through the issuance of writs of garnishment.  Those efforts were not successful, and post-judgment interest continues to accumulate.[13]  The court is informed that other creditors also have obtained judgments against the Authority which remain unsatisfied.[14]

The "WaterMark Place" outlet mall is operated by VisionLand Outlet Center, L.L.C., which holds a 99-year ground lease of the property.  When the Authority and VisionLand Outlet Center first entered into a lease agreement on July 29, 1998, the rent was one dollar per year, in addition to a "landlord surcharge" in an amount equal to four percent (4%) of the gross amount of all goods and services sold from the leased premises.[15]  Less than three months after executing the original lease agreement, however, on October 22, 1998, the Authority and VisionLand Outlet Center, L.L.C., agreed to amend the ground lease.[16]  The amendment reduced the amount of the "landlord surcharge" to an amount equal to two percent (2%) of the gross amount of all goods and services sold from the

---

[10]Defendant's Exhibit 3, at 2-3.

[11]Upon reassignment of this action to the undersigned, the case number became No. CV-00-*S*-1937-S.

[12]Upon reassignment of this action to the undersigned, the case number became No. CV-01-*S*-2040-S.

[13]*See* Orders entered on November 14, 2001, No. CV-01-BU-2040-S (doc. nos. 95 & 96).

[14]The total amount of the judgments was not placed into evidence.

[15]Plaintiff's Exhibit 3, at 7.

[16]Plaintiff's Exhibit 4.

leased premises. A year later, on October 22, 1999, the ground lease was amended yet again, and the Authority and VisionLand Outlet Center agreed to the following:

> In consideration of (a) the sales taxes to be generated from sales of merchandise from the VisionLand outlet center that will be distributed to the entities constituting the Landlord according to the Interlocal Agreement, (b) the creation of new jobs at the VisionLand outlet center, and (c) the increase in public exposure to the VisionLand Amusement Park and the VisionLand Aquarium due to the VisionLand outlet center, Sections 4.2 (Landlord Surcharge), 4.3 (Monthly Statements of Gross Sales), 4.4 (Annual Statement of Gross Sales) and 4.5 (Late Fee) of the Ground Lease are hereby deleted to eliminate all references in the Ground Lease to the Landlord Surcharge.[17]

In other words, following the second amendment of the ground lease, VisionLand Outlet Center was obligated to pay in rent only one dollar ($1.00) each year to the Authority. According to the City of Bessemer Revenue Department, the gross amount of all goods and services sold from the leased premises during the 2001 calendar year was $27,650,000.[18] Two percent of that amount would have generated $553,000 in revenue for the Authority, and four percent would have provided $1,106,000.

The Honorable Larry Langford, Mayor of the City of Fairfield, Alabama, is Chairman of the Authority's Board. Mayor Langford testified during the hearing conducted on April 16, 2002 that the Authority is insolvent. He confirmed that all of the funds contributed by the municipalities pursuant to the terms of their funding agreement have been disbursed to the bondholders, due to the Authority's default under the mortgage and trust indenture.

Mayor Langford also testified that the "E-Zone" portion of the Authority's property had been leased to Harold Gilchrist, an investment banker, who paid one dollar in annual rentals. The lease was cancelled upon Mr. Gilchrist's death, however, and that parcel currently is being offered for sale

---

[17]Plaintiff's Exhibit 5.

[18]Plaintiff's Exhibit 10.

for $4 million.

The Authority has a listing contract with International Theme Park Sales to market VisionLand park for sale. Mayor Langford estimated that the 200 acres of land on which the amusement park is located is worth about $20 million, and that the park's other assets, such as rides and exhibits, are worth an additional $25-30 million, assuming a buyer could be found.

With respect to the ground lease between the Authority and VisionLand Outlet Center, L.L.C., Mayor Langford explained that the two amendments to the original lease agreement, which first constricted, and then strangled the "landlord surcharge" revenue stream, were motivated by a desire to lure *tenants* to the outlet mall, and, *paying customers* to the amusement park. Mayor Langford testified that he was informed by Colin Coyne, the Manager of the outlet center development, that the "landlord surcharge" — when added to the 8% sales tax levied by the City of Bessemer, Jefferson County, and the State of Alabama — discouraged potential tenants. He stated that the Authority agreed to the elimination of the surcharge because it believed that attracting people to the outlet center would concomitantly increase attendance (and therefore revenues) at the adjacent VisionLand amusement park. In fact, the amusement park's attendance did increase, but not sufficiently to make it a solvent operation.

Finally, Mayor Langford testified that negotiations with bondholders are ongoing, and that the Authority still hopes to open the park on May 23, 2002, even if in only a limited capacity. During 2000, VisionLand's manager was replaced by Cedar Fair of Sandusky, Ohio, a theme park management company. During 2001, the Authority entered into a management contract with N-Ovation, another professional management company.[19]

---

[19]Plaintiff's Brief in Support of Motion for Appointment of Receiver (No. CV-00-S-1937-S, doc. no. 202, at 10; No. CV-01-S-2040-S, doc. no. 125, at 10).

## II. DISCUSSION

MAFC requests this court to appoint a receiver, contending that is the only way to protect the Authority's assets for the benefit of its creditors, including MAFC. The Authority and SunTrust oppose MAFC's motion, arguing that it has not carried the burden of demonstrating that appointment of a receiver is warranted.

"Federal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction." *National Partnership Investment Corp. v. National Housing Development Corporation*, 153 F.3d 1289, 1292 (11th Cir. 1998). "The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property." 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil 2d* § 2983 (1997), at 24. "[F]actors typically warranting appointment are a valid claim by the party seeking the appointment; probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy, and likelihood that appointing the receiver will do more good than harm." *Aviation Supply Corporation v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 317 (8th Cir. 1993). "[T]he power to appoint a receiver with authority to take custody and control of property and operate it as a going concern is a delicate one which is jealously safeguarded, and it should be exerted sparingly. A court should be cautious and circumspect in the exertion of the remedy because perversion or abuse may work great hardship." *Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944). An examination of the relevant factors and the evidence presented leads the court to the conclusion that the appointment of a receiver is not warranted in these circumstances.

8

There is no question that MAFC has a valid legal claim to the property of the Authority, based on the judgments it obtained against the Authority in these consolidated actions.

Plaintiff contends that "the Authority has fraudulently transferred millions of dollars in assets in an apparent attempt to defraud or otherwise hinder its numerous creditors." Plaintiff cites the Authority's ground lease with VisionLand Outlet Center, L.L.C., and the amendments thereto, in support of this claim, arguing that "in exchange for nothing, the Authority gave away a multi-million dollar revenue stream and the only profitable asset it possessed."[20] Proof of fraud is not required; however, this factor may be satisfied if the court finds that there is sufficient evidence to raise an inference that the transfer may have been fraudulent. *See Bookout v. Atlas Financial Corp.*, 395 F. Supp. 1338, 1342-43 (N.D. Ga. 1974) ("badges of fraud" present in the transfers and "financial manipulations" engaged in by defendant), *aff'd* 514 F.2d 757 (5th Cir. 1975); *Haase v. Chapman*, 308 F. Supp. 399, 405 (W.D. Mo. 1969) ("[T]he concurrence of time of the transfer [after a finding of liability but prior to entry of judgment] and the person to whom it was transferred [the defendant's brother], plus the fact that the transferee was and is not only out of the jurisdiction but out of the United States, offer strong probable cause to infer at this stage that the transfer was fraudulent."), *aff'd* 420 F.2d 1384 (10th Cir. 1970).

Alabama Code § 8-9A-4(b) lists the following factors which may be considered as indicia of actual intent to defraud a creditor: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) the debtor had been sued or threatened with suit prior to the transfer; (5) substantially all of the debtor's assets were transferred; (6) the debtor absconded; (7) the debtor removed or

---

[20]Plaintiff's Brief in Support of Motion for Appointment of Receiver (No. CV-00-S-1937-S, doc. no. 202, at 9; No. CV-01-S-2040-S, doc. no. 125, at 9).

concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Ala. Code § 8-9A-4(b) (1975) (1993 Replacement Volume).  Fraud may also be found

> if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor:
>
> > (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Ala. Code § 8-9A-4(c) (1975) (1993 Replacement Volume).  These provisions are set out for illustrative purposes only, as this court ultimately finds that it need not determine whether the Authority violated this statute.

This court finds that MAFC has not presented evidence sufficient to raise an inference that the amendment of the ground lease to eliminate the landlord surcharge was fraudulent.  The second amendment, which ultimately eliminated any "landlord surcharge," was executed on October 22, 1999, *before* MAFC filed a complaint against the Authority, and well before MAFC obtained judgments against the Authority for failing to pay the amounts owed under the contract.[21]  The evidence presented to this court does not establish an "insider" relationship between the Authority

---

[21]The complaint filed in No. CV-00-BU-1937-S alleges that the breach of contract was based on the Authority's failure to make the required payment due to MAFC on May 31, 2000.  Complaint (doc. no. 1) ¶ 16, at 3.  Accordingly, the claim had not arisen at the time the second amendment of the ground lease was executed.

and VisionLand Outlet Center, L.L.C., and there is simply no evidence that the purpose of the amendments to the ground lease was to divert the Authority's assets, to place them out of the reach of the Authority's creditors. Mayor Langford testified that the Authority was willing to forego the landlord surcharge in order to attract potential tenants to the outlet center and, thereby, more paying customers to the amusement park. While the elimination of a potentially-lucrative, annual revenue stream caused this court to question the business judgment or necessity for the ground lease amendments, the court cannot conclude from the evidence presented by plaintiff that the Authority's amendatory decisions were based in fraud.

MAFC nevertheless contends that the appointment of a receiver is the only way to conserve the assets of the Authority for the creditors' benefit. MAFC acknowledges that the Authority has no funds to open the park for the 2002 season, but asserts, without evidentiary support, that a receiver would be able to raise money to continue to operate the park. The Authority and SunTrust argue in response that the appointment of a receiver to operate the park would be futile. They point to SunTrust's superior and vastly *under*secured claim of $90 million against the Authority's assets as evidence that it is unlikely that appointment of a receiver would do more good than harm. In particular, SunTrust characterizes MAFC's interest as *de minimis* compared to that of SunTrust's bondholders, and in light of the $25 million asking price for VisionLand park.[22] In sum, SunTrust argues that "the appointment of a receiver cannot change the priority of the liens, the value of the property, or the fact that the proceeds from the Authority's assets will be insufficient to satisfy the [SunTrust's] first priority lien and then the subordinate liens."[23] Indeed, SunTrust has already begun

---

[22]Opposition of SunTrust Bank as Trustee to the Motion of Massachusetts Asset Financing Corporation for the Appointment of a Receiver (No. CV-00-S-1937-S, doc. no. 206), at 5.

[23]*Id.* at 6.

to pursue remedies pursuant to the mortgage and trust indenture for the Authority's default by demanding possession of VisionLand park.

The court finds SunTrust's arguments to be persuasive. MAFC's interest in the Authority's assets can indeed be characterized as *de minimis*, in that plaintiff's combined judgment amount of $1,663,019.60 (discounting post-judgment interest) is only 1.85% of the $90,000,000 owed SunTrust's bondholders pursuant to the terms of the Authority's mortgage and trust indenture. The court further observes that the Authority has retained at least two experienced theme park management companies in an effort to reverse the financial downturn. The court is unconvinced that a receiver would succeed where those managers have failed. No possible interpretation of the evidence before the court could suggest that the appointment of a receiver would benefit MAFC more than it would harm the Authority.

Finally, this court is not entirely persuaded that MAFC has exhausted all of its available legal remedies. MAFC made much of its contention that the second amendment to the ground lease between the Authority and VisionLand Outlet Center constituted a fraudulent transfer, but MAFC has not brought an action against the Authority on this basis.

### III. CONCLUSION

For the foregoing reasons, the court concludes that MAFC has failed to establish that the appointment of a receiver is warranted in these circumstances. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _19th_ day of April, 2002.

United States District Judge

12